IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| THORIN JOHN LINDSTROM and KRISTIN KATHLEEN LINDSTROM,<br><br>Plaintiffs,<br><br>vs.<br><br>MOFFETT PROPERTIES; WILLIAM B. MOFFETT; and MICHAEL REID,<br><br>Defendants. | CIVIL NO. 16-00079 DKW-RLP<br><br>**ORDER DENYING (1) DEFENDANT MICHAEL REID'S MOTION FOR SUMMARY JUDGMENT; AND (2) DEFENDANTS MOFFETT PROPERTIES AND WILLIAM B. MOFFETT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

The Lindstroms allege that they were unable to build a home at their desired

site on a parcel of land purchased from seller Michael Reid because a large amount

of "fill" on the property was not adequately disclosed prior to closing.   Although it

is undisputed that Reid generally disclosed the presence of fill prior to the sale, the

Lindstroms allege that he and realtor William Moffett of Moffett Properties knew

much more.   The Lindstroms assert that they would not have purchased the vacant

parcel had Defendants disclosed the magnitude of the fill, based on the information

available to them at the time.

Defendants seek summary judgment on the Lindstroms' claims for breach of

contract and misrepresentation.   Defendants contend that they satisfied their

obligations to the Lindstroms principally because they had no information to provide beyond disclosing the presence of fill—which was, in any event, obvious to a reasonable observer upon visual inspection.   Upon careful consideration of the entirety of the record, however, genuine issues of material fact remain with respect to several matters—notably, what information concerning the fill was available to Defendants prior to the sale and what a reasonable observer would have seen upon viewing the parcel.   The Court therefore DENIES both Motions for Summary Judgment, as detailed below.

## BACKGROUND

## I.   Factual Background

The Lindstroms purchased Lot 35A, a 1.95-acre parcel of vacant land, from Reid in early 2014.   Lot 35A is located at 108A Pua Niu Way, Lahaina, Maui, Hawaii 96791 (the "Property").   Reid acquired the parcel, together with an adjoining one (Units A and B), in April 2013.   George Van Fischer, a licensed real estate salesperson and employee of Moffett Properties, represented Reid in the 2013 sale.   Decl. of George Van Fischer ¶ 2, Dkt. No. 79-1.

In January 2014, Reid sold the smaller of the two lots, Unit B, with an existing cottage.   *Id.*   On February 18, 2014, Reid entered an Exclusive Right-To-Sell Listing Agreement with Moffett Properties to list the larger vacant parcel, Unit A, for $1,350,000.   Fischer Decl., Ex. A (Listing Agreement), Dkt. No. 79-2.

The Lindstroms, who already owned another home in the same Launiupoko subdivision, contacted Defendant William B. ("Buz") Moffett, after seeing a "For Sale" sign on the lot, and Moffett showed them the Property in February 2014. Decl. of William B. Moffett ¶¶ 2–3, Dkt. No. 79-4.   While viewing the Property, Moffett claims that Thorin Lindstrom told him that he wanted to build a home "alongside the ravine on the westernmost end of Property."   Moffett Decl. ¶ 5. When Moffett "pointed out to him the obvious presence of uncompacted, loose fill in that area of the lot which would not allow him to build in that area . . . [Lindstrom's] response to [Moffett's] warning was, 'you'd be surprised what I can do.'"   Moffett Decl. ¶ 5.   Lindstrom acknowledges seeing "loose rocks and boulders on the property" but otherwise denies having the conversation described by Moffett.   7/20/17 T. Lindstrom Dep. Tr. at 54, Dkt. No. 75-3; Decl. of Thorin Lindstrom ¶ 11, Dkt. No. 86-1.

Moffett prepared a Purchase Contract, with a counter-offer for the Property of $1,000,000, and a Dual Agency Consent Addendum,[1] which were signed by Thorin Lindstrom on February 25, 2014.   Moffett Decl. ¶ 4, Ex. B (Purchase Contract; Dual Agency Agreement).   On February 28, 2014, Reid countered at $1,224,000, and the Lindstroms accepted on the same date.   Reid's counter included an "As Is"

_____

[1]Under the dual agency addendum, Moffett Properties acted as the real estate broker for both buyer and seller in the transaction.

Condition Addendum.   Moffett Decl. ¶ 4, Ex. C (Counteroffer; "As Is" Addendum).

On March 7, 2014, Reid provided a Seller's Real Property Disclosure Statement, which required him to disclose all "material facts" concerning the Property.   Fischer Decl., Ex. G. (Seller's Disclosure), Dkt. No. 79-3.   Fischer assisted Reid in the preparation of the Seller's Disclosure.   To do so, the two met at Reid's home and drafted responses to questions on the standard form, based upon information contained in a Preliminary Title Report from Reid's 2013 purchase. Fischer Decl. ¶ 9.   According to Reid, when Fischer knew something about the Property that he did not, Reid included that information as well.   Decl. of Michael Reid ¶ 9, Dkt. No. 75-2.   When Reid and Fischer finished going over all of the questions on the form, Fischer offered to type the answers, physically complete the form, and send it to Reid for his electronic signature via DocuSign, in order to promptly transmit it to the Lindstroms.   Reid Decl. ¶ 10.

The questions on the Seller's Disclosure form asked whether certain conditions were present on the Property and corresponding response boxes were provided to check either "YES," "NO," "NTMK," or "NA."   If the response to a question was "YES," Reid was directed to "explain all material facts known to you in Section H."   Of importance here, Reid checked "YES" in response to Question 41, which asked: "Is there filled land on the Property?"   He did not include any

further explanation in Section H, as directed on the form, or in the attached, typed addendum that included his explanations to the other questions with affirmative responses. *See* Seller's Disclosure at 2, 5. According to Reid, although it was obvious that there was fill present on the lot due to the loose, large rocks on the perimeter of the northwestern edge of the Property, he did not know "how much fill was on the property nor the nature of the fill beyond the large rocks that were visible. The totality of [Reid's] knowledge was the belief that there was fill present on the property." Reid Decl. ¶ 11.

Reid acknowledges that "the addendum to the disclosure does not contain a narrative to accompany [his] 'yes' answer with respect to fill." Reid Decl. ¶ 12. He explains the omission as follows:

> That was an oversight due exclusively to the fact that there was no additional information to provide beyond identifying that fill was present. Had a narrative been included, it would have simply been that fill is present and I had no additional information to provide as to either the nature of the fill or the extent of the fill. In other words, the "yes" answer to the fill question was all of the information that I had to provide to a prospective buyer.

Reid Decl. ¶ 12.

Fischer, however, had additional knowledge regarding the fill. He observed a "substantial amount of fill in the ravine at the western or Makai end of the Property." Suppl. Fischer Decl. ¶ 5, Dkt. No. 90-8. At his deposition, Fischer

estimated that "hundreds if not thousands of yards of fill" were present in that area. 1/17/18 Fischer Dep. Tr. at 82–83, Dkt. No. 86-12. Fischer explained his understanding of the disclosures in the following manner:

> If I had observed fill in other areas of the Property, I would have disclosed that condition to Buz Moffett for disclosure to the Plaintiffs. Since I did not observe fill in other areas, I did not discuss with Buz my estimate of the amount of fill that was in the ravine in terms of yards of material as it would have been speculation on my part as no soils studies had been done. Buz and I met on this parcel several times and did discuss at length that there was unstable fill in the western ravine. In these conversations I also shared that the rest of the lot appeared to be solid with many area[s] of solid undisturbed rock exposed.

Suppl. Fischer Decl. ¶ 5. Fischer also explained that he shared with Moffett that there was fill on the Property and that he understood that Moffett "shared with the Lindstroms that there was fill on the property." 1/17/18 Fischer Dep. Tr. at 87.

Moffett forwarded the Seller's Disclosure to Kristin Lindstrom on March 7, 2014. He also discussed the disclosures with the Lindstroms, who did not have any questions "regarding the disclosure of the presence of fill on the Property." Moffett Decl. ¶ 15. Moffett "assumed that they knew it referred to the loose fill in and near the ravine that we all saw at the early inspections of the Property and that they would consult with [their architect Marty] Cooper regarding fill condition at the Property." Moffett Decl. ¶ 15. According to Moffett, he asked the Lindstroms "if they planned on having soils studies done, because of the fill on the Property, but they said their

contractor said one was not necessary." Moffett Decl. ¶ 6. When Moffett offered his assistance in providing referrals to geotechnical professionals "to evaluate the soils conditions," he claims that the Lindstroms declined, "stating they had their own contacts [to] do such work." Moffett Decl. ¶ 6. Based upon their responses, Moffett assumed that the Lindstroms "understood that they could not build alongside the western end of the Property because of the loose, uncompacted fill, but that they would perform their due diligence by having the condition inspected." Moffett Decl. ¶ 7.

The Lindstroms dispute this version of events. According to Thorin Lindstrom, "Moffett did not warn us to have the fill condition investigated by professionals." T. Lindstrom Decl. ¶ 11. "Moffett never inquired if we wanted to order a soils study or if we had asked our contractor about one." T. Lindstrom Decl. ¶ 14. "If Moffett mentioned for us to get a soils study because he was concerned about the fill, Kris and I would not have purchased the lot knowing it would potentially need a large amount of work." T. Lindstrom Decl. ¶ 11. Kristin Lindstrom likewise denies that Moffett "mentioned the uncompacted loose fill which would not allow building in any areas on the Property." K. Lindstrom Decl. ¶ 9. She claims that "the only mention of the fill was from Moffett, telling us the property was graded flat and ready to build." K. Lindstrom Decl. ¶ 11.

During the inspection period in late February and early March 2014, Moffett assisted the Lindstroms by providing to them and their architect copies of the Farm Site Plan, Farm Plan Unilateral Agreement, CPR documents and condominium map. Moffett. Decl. ¶¶ 9–10.   Moffett also helped Marty Cooper, the Lindstroms' architect, by contacting Atom Kasprzycki, the architect of the cottage on Unit B, who previously created CAD files of the farm plans and a topographic map. Moffett. Decl. ¶¶ 11–12.   On March 4, 2014, Kasprzycki emailed to Cooper, Moffett, and Kristin Lindstrom, a topographic file and CPR plans in DWG format, the Farm Plan and Approval Letter, and a document described by Kasprzycki as a "Site Study related to developers fill on lot during subdivision development." Moffett. Decl. ¶ 13, Ex. F (3/4/14 Email).   Because neither Moffett nor the Lindstroms possessed the necessary software, they were unable to open or view the attached files.   Moffett. Decl. ¶ 13; K. Lindstrom Decl. ¶ 16.   Cooper did not review portions of the attached documents, in particular those relating to fill, *see* 7/27/17 Cooper Dep. Tr. at 36–39, 70–81, Dkt. No 75-5, and in any event, the Lindstroms maintain that he was not retained to perform an investigation of the fill or soil conditions.   K. Lindstrom Decl. ¶ 15.   Moffett believed that Cooper, "having received the topographic map and site studies on March 4, 2014, would be advising the Lindstroms if further investigations of the fill condition were recommended."   Moffett. Decl. ¶ 13.   Cooper, however, did not.

Prior to closing, the Lindstroms did not inspect the Property. 7/20/17 T. Lindstrom Dep. Tr. at 53–54, Dkt. No. 75-3; T. Lindstrom Decl. ¶ 7 ("We didn't think [inspection] was necessary since we were purchasing an empty lot that was represented as being ready for a house to be built."). After closing, the Lindstroms were not able to obtain the necessary permits from the County of Maui to build a residence on their desired location on the Property. In November 2014, the Lindstroms "first learned from Rulan Waikiki from the Maui County Planning Department that the Property . . . purchased from Reid had massive amounts of fill up to 35 feet above original grade." T. Lindstrom Decl. ¶ 16; *see also* 1/17/18 Rulan Waikiki Dep. Tr. at 19 (explaining that Maui County "rules and regulations specify a maximum building height of 30 feet from natural or finished grade, whichever is lower," but that if a planned structure is in excess of 30 feet, the County "cannot approve the building permit application"), Dkt. No. 86-11.

According to the Lindstroms, they learned that the "massive amount of fill contained uncompacted material, some of which was trash, from Kenneth Stewart, the soils engineer hired by [their] attorney." However, prior to November 2014, they "were unaware of the massive amounts of fill on the Property . . . and would not have bought the property knowing the land work would have put this house out of budget." K. Lindstrom Decl. ¶¶ 4–5; *see also* T. Lindstrom Decl. ¶¶ 4–5, 12 ("The

costs of the lot with grading/site work would have been cost prohibitive.").[2]   The

Lindstroms sold the Property during the pendency of this litigation.   7/20/17 T.

Lindstrom Dep. Tr. at 99.

## II.   **Procedural Background**

The Lindstroms allege that the Property is unsuitable for their intended

purposes, because they could not build a home in their planned location, and that its

---

[2]According to the summary report submitted by the Lindstroms' geotechnical engineer, Kenneth Stewart, "roughly 7,000 cubic yards of fill was placed in the gully on the lot," between the time a grading permit was obtained from the County in 2005 and a land survey was performed in 2007. Pls.' Ex. 5 (10/18/17 Stewart Report), Dkt. No. 86-7.   Stewart's review of two topographic maps prepared in 2005 and 2007, and his field work on the site in 2015, resulted in the following conclusions:

1.  Based on the contours, it appears that fill up to approximately 25 feet thick was placed in the gully prior to the Lindstroms' purchase of the lot.

2.  The apparent fill thickness confirms our opinion that a geotechnical investigation of the lot was required by the Maui County Grading Code prior to filling the gully on the lot with fill that is deeper than 15 feet.

3.  It also confirms that a report after grading is required by the Grading Code, prepared by a geotechnical engineer, and certifying that the fill was placed and compacted in accordance with the Maui County Grading Code and the recommendations of the geotechnical report.

4.  Based on the overlaid contours, I estimate that a total of roughly 7,000 cubic yards of fill was placed in the gully on the lot.   This is significantly higher than the 3,266 cubic yards shown on the Application for Grading & Grubbing Permit for the lot, dated October 18, 2005.

5.  Apparently a significant amount of uncontrolled, unpermitted grading and dumping occurred on the lot that was not covered by the grading permit, especially in the western end of the lot.

*Id.*

resulting value is substantially less than what they paid for it.   Compl. ¶ 11.

Plaintiffs filed their Complaint on February 23, 2016, asserting the following causes

of action: (1) breach of contract against Reid (Count I); (2) breach of contract and

fiduciary duty against Moffett Properties (Count II); (3) breach of express and

implied warranties against Reid (Count III); (4) rescission (Count IV); (5) tortious

breach of contract against Reid (Count V); (6) intentional and negligent

misrepresentation against all Defendants (Count VI); (7) fraud against all

Defendants (Count VII); and (8) unfair and deceptive trade practices ("UDAP")

against Moffett Properties (Count VIII).   Only the claims for breach of contract and

negligent misrepresentation remain against Reid following the Court's partial grant

of his motion to dismiss.[3]

Reid and the Moffett Defendants seek summary judgment on all remaining

claims.   Although the Complaint alleged several bases for the breach of the parties'

Purchase Agreement for the sale of the Property and other obligations, the primary

focus at the summary judgment stage has been narrowed to Defendants' failure to

fully disclose the nature and the extent of the fill on the Property, and whether this

_____

[3]In an April 5, 2017 Order, the Court granted in part Reid's Motion to Dismiss as follows: Counts
III (Breach of Express and Implied Warranties), IV (Rescission), and V (Tortious Breach of
Contract) were dismissed with prejudice, and, although the claims for intentional
misrepresentation (Count VI) and fraud (Count VII) were dismissed with leave to amend, the
Lindstroms elected not to file an amended complaint.   Dkt. No. 36 (4/5/17 Order).

amounts to an actionable misrepresentation, a common element essential to the remaining claims.[4]

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

By checking "YES" in response to Question 41 on the Seller's Disclosure, Reid acknowledged that there was fill on the Property.  However, he failed to offer any further explanation or detail, as required by the form.  Whether Reid (1) "believed no explanation was necessary because [he] did not know anything [more] about the fill," or, alternatively (2) believed that "the document required something by way of explanation and so his not explaining that he had no further

---

[4]For example, Plaintiffs have not advanced their prior claims regarding (1) "defects" in the Property or (2) disclosure issues related to improper grading without a permit or in excess of what was permitted.  Because these matters were not addressed by the parties, the Court does not discuss them further.

relevant facts about the fill was an oversight by him," Reid Reply at 6, Dkt. No. 89, his failure to include *any* further explanation presents an issue of fact as to whether the Seller's Disclosure was complete, "prepared in good faith and with due care." That is particularly the case because, on the disputed record before the Court, there are material facts "within the knowledge or control of Seller" regarding the fill that were not made known to the Lindstroms prior to the sale. Accordingly, summary judgment with respect to the remaining claims cannot be entered.

I.      **Whether the Seller's Disclosure Statement Was Prepared in Good Faith and With Due Care Remains an Issue of Fact Precluding Summary Judgment in Favor of Defendants**

Defendants collectively argue that no cause of action may lie against them for breach of contract or fiduciary duty, intentional or negligent misrepresentation, or for violation of Hawaii Revised Statutes ("HRS") Chapter 480 because the Seller's Disclosure was prepared in good faith and with due care. *See* HRS § 508D-9 ("A buyer shall have no cause of action against a seller or seller's agent for, arising out of, or relating to the providing of a disclosure statement when the disclosure statement is prepared in good faith and with due care. For purposes of this section, 'in good faith and with due care' includes honesty in fact in the investigation, research, and preparation of the disclosure statement[.]"). As detailed below, whether the lack of narrative explanation for the fill disclosure was inadvertent, or because Reid had no further information to provide, or because Defendants assumed

that full disclosure had otherwise been made to the Lindstroms, Defendants fail to establish that they are entitled to judgment as a matter of law with respect to the Lindstroms' claims sounding in contract or tort arising from the omission in the Seller's Disclosure.

## A.      The Purchase Agreement and Seller's Disclosure

The Purchase Contract requires that Reid provide a Seller's Disclosure, prepared in good faith and with due care, and that he disclose all material facts relating to the subject property that (1) are within his knowledge or control; (2) can be observed from visible, accessible areas; or (3) are required to be disclosed by statute, HRS §§ 508D-4.5 and -15.[5]  Fischer Decl., Ex. B (Purchase Contract), Dkt. No. 79-5.  The Purchase Contract cautions the Lindstroms that "[t]he Disclosure Statement is NOT a warranty of any kind.  Under Chapter 508D, the Disclosure

---

[5]The statute also defines the following terms used in the purchase documents:

> "Disclosure statement" means a written statement prepared by the seller, or at the seller's direction, that purports to fully and accurately disclose all material facts relating to the residential real property being offered for sale that:
>
>> (1) Are within the knowledge or control of the seller;
>> (2) Can be observed from visible, accessible areas; or
>> (3) Are required to be disclosed under sections 508D-4.5 and 508D-15.
>
> "Material fact" means any fact, defect, or condition, past or present, that would be expected to measurably affect the value to a reasonable person of the residential real property being offered for sale.  The disclosure statement shall not be construed as a substitute for any expert inspection, professional advice, or warranty that the buyer may wish to obtain.

HRS § 508D-1.

Statement "shall not be construed as a substitute for any expert inspection, professional advice, or warranty that Buyer may wish to obtain." Purchase Contract at 6.

The Seller's Disclosure completed by Reid with Fischer's assistance states the following:

> This is a statement concerning information relating to the condition of Property that: (i) is within the knowledge or control of Seller; (ii) can be observed from visible, accessible areas; or (iii) which is required by Section 508D-4.5 and 508D-15, Hawaii Revised Statutes. Seller may not be aware of problems affecting Property, and there may be material facts of which Seller is not aware that qualified experts may be able to discover or time may reveal. Unless Buyer has been otherwise specifically advised, Seller has not conducted any inspections of generally inaccessible areas of Property. BUYER SHOULD TAKE CARE TO PROTECT BUYER'S OWN INTEREST BY OBTAINING PROFESSIONAL ADVICE AND BY CONDUCTING THOROUGH INSPECTIONS AND OBTAINING EXPERT HELP IN EVALUATING PROPERTY AND BY OBTAINING BUYER'S OWN PUBLIC RECORDS. The statements made below are made by Seller and are not statements or representations of a Seller's agent.

Seller's Disclosure at 1.

Thorin Lindstrom acknowledged the following upon signing the Receipt of Seller's Disclosure on March 10, 2014:

> Buyer may wish to obtain professional advice and/or inspections on the Property within the time frames on the Purchase Contract as agreed to by Buyer and Seller. Unless Buyer has been otherwise advised, Seller has not conducted an inspection of generally inaccessible areas of the Property. There may be

> material facts of which Seller is not aware which qualified experts may be able to discover or latent or hidden defects which time may reveal. . . . Responses cannot be considered to be substitutes for a careful inspection of the Property by Buyer and/or any inspections which Buyer may choose to obtain.

Seller's Disclosure at 5.

Although the Seller's Disclosure does not require Reid or his agent to undertake any "inspections of generally inaccessible areas," the seller is "obligated to fully and accurately disclose in writing to a buyer all 'material facts concerning the property." Seller's Disclosure at 1. And "'material facts' are defined as 'any fact, defect, or condition, past or present, that would be expected to measurably affect the value to a reasonable person of the residential property being offered for sale." Seller's Disclosure at 1.

### B. Whether Reid Exercised "Due Care" Under the Circumstances Is an Issue of Fact that Cannot Be Resolved on Summary Judgment

Defendants maintain that they are entitled to summary judgment on the Lindstroms' claims for breach of contract because Reid, with Fischer's assistance, completed the Seller's Disclosure in good faith and with due care, fully disclosing all known defects and issues with the Property. There are, however, several issues that call into question whether that assertion is true.

First, although he checked the "YES" response, indicating that there was "filled land on this Property," Reid neglected to "explain all material facts known to

[him] in Section H," as directed by the instructions on the form.   According to Reid, the "totality of [his] knowledge was the belief that there was fill present on the property," Reid Decl. ¶ 12, and he therefore had no additional information to offer:

> I acknowledge that the addendum to the disclosure does not contain a narrative to accompany my "yes" answer with respect to fill.   That was an oversight due exclusively to the fact that there was no additional information to provide beyond identifying that fill was present.   Had a narrative been included, it would have simply been that fill is present and I had no additional information to provide as to either the nature of the fill or the extent of the fill.   In other words, the "yes" answer to the fill question was all of the information that I had to provide to a prospective buyer.

Reid Decl. ¶ 13.   In response to questioning during his deposition, Reid verified that "the omission of any explanation" to Question 41 in the addendum of the Seller's Disclosure was "unintentional."   1/18/18 Reid Dep. Tr. at 46.   The Court cannot say, as a matter of law, that Reid's "unintentional" "oversight" when completing the Seller's Disclosure with respect to the critical issue of fill represented an exercise of "due care," entitling Defendants to judgment in their favor.

Second, and more significantly, the record demonstrates that Reid's agent, Fischer, had further information regarding the quantity of fill and aided Reid in the completion of the Seller's Disclosure, providing additional information based upon his knowledge and expertise, and physically compiling and transcribing the form

during their in-person meeting. Reid even stated that to the extent Fischer had additional information about the Property that Reid did not, that additional information went onto the disclosure form. Yet Fischer's additional observations regarding the quantity of fill are also absent from Section H or the addendum. Reid Decl. ¶¶ 9–10; Suppl. Fischer Decl. ¶8. The record demonstrates that Fischer observed what he estimated were "hundreds, if not thousands of cubic yards" of fill on the Property. *See* 1/18/18 Reid Dep. Tr. at 42; 1/17/18 Fischer Dep. Tr. at 84–85. That information, which can hardly be considered anything other than "material" within the meaning of HRS § 508D-1, is nowhere to be found in the disclosures. When asked at deposition why his observations regarding the quantity of fill were not included in the Seller's Disclosure, Fischer explained that he felt the quantity was "irrelevant" because there was other buildable area on the lot:

> Q. You've just described that your observations were that there was substantial fill and you even gave me a quantification of thousands of cubic yards, do you remember that?
>
> A. I said there could be hundreds, possibly thousands of cubic yards, yes.
>
> Q. Isn't that a material fact that should have been disclosed on this addendum?
>
> A. It was irrelevant to the -- the viability of building on the lot. The lot was over an acre in size and there was a full substantial area of building -- buildable area or appeared to be buildable area available to build on the lot. It's common for lots on West Maui to have fill on their pads, some good

fill/some bad fill, to take advantage of the views. So seeing fill such as that not in the only buildable area would not be any cause for concern or any cause for further exploration or cause for further disclosure other than to state that there's fill on the property.

Q. So other than an assumption that there's other buildable area on that lot, was there any other reason why an explanation was not given on [the Seller's Disclosure]?

A. The only reason that no further explanation was given was because Mike [Reid] didn't have any other material facts, as stated in here or any other form, regarding the fill. He could see that there was fill, but he had no knowledge as to what it was, how much there was, or any context.

Q. Wasn't he aware that there was substantial fill and it could be as much as hundreds, if not thousands of cubic yards?

\*\*\*\*

THE WITNESS: I don't -- I don't have an answer for that. I know what I thought because I have expertise, but I don't know particularly what he thought. I highly doubt that he had any idea of how much material was there or what was involved.

1/17/18 Fischer Dep. Tr. at 83–85. Reid's and Fischer's varying justifications for the failure to include an explanation in the narrative addendum reflect both intentional and unintentional explanations for the omission. These explanations also reveal that additional information regarding the nature and the extent of the fill was "within the knowledge or control" of Reid by virtue of his work with Fischer and was not made available to the Lindstroms as part of the Seller's Disclosure.

That amounts to genuine issues of material fact regarding whether Reid exercised good faith and due care in the completion of the Seller's Disclosure, which preclude summary judgment.

### 1.     Breach of Contract (Counts I and II)

As discussed above, because issues of fact persist with respect to the seller's obligation to exercise due care and to fully disclose all material facts, Defendants are not entitled to summary judgment on the Lindstroms' breach of contract claims.

Defendants assert that, notwithstanding any failure to include a narrative explanation in the Seller's Disclosure, the Lindstroms were, in fact, provided information about the substantial quantity of fill in the documents sent by Kasprzycki to Marty Cooper, Kristin Lindstrom, and Buz Moffett on March 4, 2014. The record on this point, however, is disputed.   None of the recipients viewed the Site Study or other enclosures sent by Kasprzycki showing the depth or location of the fill, two of the recipients did not have the software necessary to view the enclosures, it is unclear what additional fill information those enclosures provided, and it is equally unclear whether or not that information was consistent with the fill information that Reid and his agents had from other sources.   *See* Moffett Decl. ¶ 13; K. Lindstrom Decl. ¶ 16; 7/27/17 Cooper Dep. Tr. at 36–39, 70–81.   The Lindstroms also assert that because Cooper was hired only to design their new home, it was not within the scope of his work to conduct an inspection or perform any due

diligence on the Property to determine whether it was suitable for the intended use prior to their purchase. 7/20/17 T. Lindstrom Dep. Tr. at 151–52; K. Lindstrom Decl. ¶ 15. In short, whether the Lindstroms actually or constructively possessed additional information prior to closing regarding the quantity of fill is a disputed question of fact on the current record.[6]

---

[6]This situation is distinguishable from the case relied upon by the Moffett Defendants, *Brinkwood Land Equities, Ltd. v. Hilo Brokers, Ltd.*, an unpublished memorandum opinion, in which the Hawaii Intermediate Court of Appeals affirmed summary judgment in favor of realtor defendants and against plaintiff purchasers who alleged that the sellers and their brokers misrepresented the property and failed to adequately disclose the area's "coqui frog problem." The ICA concluded that "Defendants produced evidence to show they had disclosed the existence of the problem and, additionally, to show Brinkwood knew about the coqui frog problem via other sources." 130 Haw. 347, 310 P.3d 1048 (Ct. App. 2012). In *Brinkwood*, the purchase contract included as attachments a "County Addendum and [a] Frog Alert advis[ing] [plaintiffs] to conduct their own inspection to ascertain whether the level of noise made by the frogs was acceptable to [plaintiffs] in terms of the purpose for which they were purchasing the Property." In contrast to the facts here, one of the *Brinkwood* principals expressly "acknowledged receipt of the County Addendum and the Frog Alert and admitted he did not do any investigation or talk to his realtor about the frog problem." *Id.*

> In addition to being informed of the coqui frog problem via the County Addendum and the Frog Alert, Singleton indicated in a July 27, 2005 memorandum . . . that he was aware of the problem. In the memo, Singleton wrote: "We also learned from the former owner, Mr. Higgins, who lived there in the 90's, that there is a serious frog problem. The creek area is infested and they croak all night. That too needs to be addressed."
>
> At the hearing on the MSJ, in answer to the circuit court's query whether there was any genuine issue of material fact about whether Brinkwood's Predecessors had received the disclosures about the frog infestation, Brinkwood admitted the disclosures had been received and Predecessors had acknowledged receipt.

*Id.* (emphasis added). On this record, the *Brinkwood* court easily concluded that the "circuit court did not err when it held there was no genuine issue of material fact in regards to Defendants' disclosure of the potential problem of coqui frog noise." 130 Haw. 347, 310 P.3d 1048. No such facts are present here.

Reid was required to "fully and accurately disclose in writing to a buyer all 'material facts' concerning the property." Whether he satisfied this requirement or breached the terms of the Purchase Agreement or Seller's Disclosure is a question of fact that the Court cannot determine at present. Accordingly, Defendants have not established that they are entitled to summary judgment on the Lindstroms' breach of contract claims.

## 2.   Breach of Fiduciary Duty (Count II)

In Count II, the Lindstroms allege that the Moffett Defendants, acting as dual agents for both buyers and seller, "breached their fiduciary duty to Plaintiffs, as well as breached their contract with Plaintiffs." Compl. ¶ 25. Under Hawaii law, "[t]he rules of agency apply to the relationship between a real estate broker and principal. The law imposes upon a real estate broker a fiduciary obligation comprised of utmost good faith, integrity, honesty, and loyalty, as well as a duty of due care and diligence." *Property House, Inc. v. Kelley*, 68 Haw. 371, 377, 715 P.2d 805, 810 (1986) (citations omitted).

> In particular, a real estate agent bears a duty to make a full, fair, and timely disclosure to the principal of all facts within the agent's knowledge which are, or may be, material to the transaction and which might affect the principal's rights and interests or influence his actions. "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would

> desire to have. . . ."   Restatement (Second) of Agency § 381, at
> 182 (1958).

*Id.* at 377, 715 P.2d at 810 (some citations omitted).

The Moffett Defendants contend that Moffett and Fischer fulfilled their fiduciary obligations to both clients under the Dual Agency Agreement.   The realtors maintain that they satisfied any obligation to disclose conditions and material facts of which they had knowledge or could easily observe, and at most, were obligated to further disclose later-acquired material facts that contradicted the Seller's Disclosure under HRS § 508D-7(c).   The record, however, is disputed with respect to whether all material information in the possession of Moffett and Fischer was communicated to the Lindstroms, as each of them independently appears to have assumed.   For example, Fischer declares that he met with Moffett on the parcel "several times and did discuss at length that there was unstable fill on the western ravine."   Suppl. Fischer Decl. ¶ 4.   Fischer opined that he and Moffett satisfied their duty of disclosure regarding the fill issue under the circumstances, explaining at his deposition:

> A:   I shared with Buz that there was fill on the property and it's my understanding that he shared with the Lindstroms that there was fill on the property.   To what extent -- so, yes, I feel we had an obligation to share that with any prospective buyer including the Lindstroms, and we did.
>
> Q:   Did you specifically share that information with the Lindstroms?

> A: No. As I previously stated, our arrangement in this transaction was that I would communicate with the seller and Buz would communicate with the buyer. I would transmit information to Buz, who would, in turn, transmit it to the buyer.

1/17/18 Fischer Dep. Tr. at 87.

Moffett, on the other hand, disclaimed any recollection of Fischer telling him that there was a substantial or specific amount of fill on the property. 1/19/18 Moffett Dep. Tr. at 26–27. He did, however, recall discussing the fill issue after receiving the Seller's Disclosure with Fischer and Thorin Lindstrom. 1/19/18 Moffett Dep. Tr. at 27. When asked, specifically, if he had ever passed on to the Lindstroms the observations from Fischer regarding the quantity of the fill, Moffett responded: "When meeting on the property with the Lindstroms, I pointed out the fill and -- but I do not believe that I said Mr. Fischer told me there was fill. It was readily observable there was fill and I pointed it out the Lindstroms." 1/19/18 Moffett Dep. Tr. at 27. The Lindstroms, for their part, deny that Moffett or Fischer ever discussed fill or the Seller's Disclosure with them, at any point. T. Lindstrom Decl. ¶¶ 5–12; K. Lindstrom Decl. ¶¶ 6–9, 18.

These particular disputed facts, in addition to the previous discussion regarding the reasonableness of Defendants' conduct under the circumstances,

illustrate the existence genuine issues of fact with respect to Plaintiffs' breach of fiduciary duty claim, precluding summary judgment on Count II.

## II. Defendants Are Not Entitled to Summary Judgment on the Remaining Misrepresentation-Based Claims

The remaining claims for negligent misrepresentation, fraud and/or intentional misrepresentation, and UDAP are based, in part, on the failure to fully disclose the fill condition on the Property. Defendants seek summary judgment on these remaining causes of action on the ground that the Lindstroms fail to establish reasonable reliance on the alleged misrepresentation or omission. Because issues of fact persist as to each claim, however, the Motions are denied.

### A. Negligent and Intentional Misrepresentation (Counts VI and VII)

Counts VI and VII, alleging negligent and intentional misrepresentation and fraud, assert that the Lindstroms "were induced by Defendants' omissions to purchase the Property, which they would not have done had the true facts about the Property been disclosed." Compl. ¶ 40. Count VI alleges that all Defendants "intentionally and/or negligently misrepresented the condition of the Property by failing to disclose to [the Lindstroms] the excessive and improper grading and fill," and that Defendants "misrepresented the condition of the Property by failing to make the required disclosures, which failures directly and proximately caused damage to Plaintiffs." Compl. ¶ 36. Count VII alleges that "failing to disclose to

Plaintiffs the excessive and improper grading and fill on the Property . . . constituted fraud by Defendants."   Compl. ¶ 39.

In a negligent misrepresentation claim, Hawai'i law requires that "(1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation."   *Blair v. Ing*, 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001) (citing Restatement (Second) of Torts § 552).   Under Hawaii law, the elements of intentional misrepresentation or fraud are as follows: "(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them."   *Shoppe v. Gucci America, Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049 (2000); *see also Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc*., 948 F. Supp. 2d 1131, 1151 (D. Haw. 2013) (same).   Under both Counts VI and VII, in other words, the Lindstroms must establish reliance.   *See, e.g.*, *Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 380 (9th Cir. 2003) (Holding that "reliance may be established on the basis of circumstantial evidence showing the alleged fraudulent misrepresentation . . . *substantially influenced* the party's choice, even though other influences may have operated as well.") (emphasis in original) (citation and quotation signals omitted).

Reid argues that Plaintiffs cannot establish reliance upon the Seller's Disclosure in light of the deposition testimony of Kristin Lindstrom, in which she stated, that when deciding to purchase the Property, the Lindstroms "relied on our real estate agent and ourselves," and did not rely on anything else. The disputed factual record, however, illustrates that the Lindstroms did purport to rely to their detriment on the omission in the Seller's Disclosure and elsewhere. Both Kristin and Thorin Lindstrom's Declarations are unequivocal that had Reid documented in the Seller's Disclosure that "'he did not know how much fill was on the property nor the nature of the fill beyond the large rocks that were visible,' [they] would not have bought the property knowing the land work would have put this house out of budget." K. Lindstrom Decl. ¶ 5; T. Lindstrom Decl. ¶ 5 (same). Moreover, according to Thorin Lindstrom, "Moffett never told us the disclosure statement was not filled out properly or that we should question it." T. Lindstrom Decl. ¶ 8; *see also* K. Lindstrom Decl. ¶¶ 14–17 ("Moffett never mentioned the incomplete declaration of the fill where Reid failed to give an explanation for Number 41 of the Disclosure Statement. . . . Moffett never told [us] he had concerns over the fill. We relied on Moffett to work in our best interest."). The Lindstroms aver that they relied upon Moffett's representations and "trusted him [that] the lot was ready to build." K. Lindstrom Decl. ¶ 19; *see also* T. Lindstrom Decl. ¶ 6 ("Moffett told us multiple times the lot was ready to build, graded flat and all we had to do was add

water; we assumed it to be true."). Viewing the evidence in the light most favorable to the non-moving party, Plaintiffs have presented evidence that raises issues of fact as to whether they reasonably relied on alleged misrepresentations and omissions regarding the fill condition on the Property.[7] Accordingly, the Motions are denied with respect to Counts VI and VII.

## B. UDAP (Count VIII)

Count VIII alleges a violation of HRS Chapter 480 against Moffett Properties for "unfair and deceptive trade practices [when they] failed to properly investigate the Property they were selling for Reid, when they failed to discover and/or disclose the defective condition of the Property, and when they failed to properly advise Plaintiffs as to their rights and obligations, thus inducing Plaintiffs to purchase the defective property and the services of [the Moffett Defendants]." Compl. ¶ 44. "[A] deceptive act or practice is (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material." *Courbat v. Dahana*

---

[7]With respect to the remaining elements of the negligent misrepresentation claim, the omitted narrative explanation precludes summary judgment, as detailed above, regarding whether Reid or the Moffett Defendants were negligent or "exercised reasonable care or competence in communicating the information" regarding the fill condition on the Seller's Disclosure or otherwise in their respective communications with the Lindstroms. Because the reasonableness of their conduct is a question of fact based upon the current record, summary judgment is not appropriate at this time for this additional reason.

*Ranch, Inc.*, 111 Hawai'i 254, 262, 141 P.3d 427, 435 (2006) (citation omitted).[8]   A

representation, omission, or practice is "material" if it involves information that is

important to consumers and is likely to affect their conduct.   *Tokuhisa v. Cutter*

*Mgmt. Co.*, 122 Hawai'i 181, 195, 223 P.3d 246, 260 (2009).

To the extent the Lindstroms' UDAP claim rests upon the same alleged

omitted disclosure with respect to the fill condition, the Court's prior analysis

applicable to their negligent and intentional misrepresentation claims likewise

applies to preclude summary judgment in favor of the Moffett Defendants.

Genuine issues of material fact exist with respect to what representations Moffett

made to the Lindstroms regarding the state of the Property, whether he advised them

that further investigation was warranted, and whether he conveyed all information

he may have received from Fischer.   Because the Lindstroms vigorously dispute

Moffett and Fischer's version of events, and, at the summary judgment stage, the

Court may not make credibility assessments or weigh conflicting evidence, issues of

fact remain with respect to Plaintiffs' UDAP claim.   *See Anderson v. Liberty Lobby,*

---

[8]Although the phrase "unfair or deceptive acts or practices in the conduct of any trade or
commerce" is not defined in chapter 480, Hawaii courts have defined "deceptive act" as "an act
causing, as a natural and probable result, a person to do that which he would not otherwise do."
*Eastern Star, Inc. v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 133, 712 P.2d 1148, 1154
(1985).   Whether an act or practice is deceptive is judged by an objective "reasonable person"
standard.   *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1092 (9th Cir. 2010)
("Hawaii's consumer protection laws look to a reasonable consumer, not the particular
consumer.").

*Inc.*, 477 U.S. 242, 249 (1986).   Accordingly, the Moffett Defendants' Motion is denied with respect to Count VIII.[9]

## CONCLUSION

For the foregoing reasons, the Court DENIES both Reid's Motion For Summary Judgment (Dkt. No. 74) and Moffett Properties and William B. Moffett's Motion For Summary Judgment (Dkt. No. 78).

IT IS SO ORDERED.

DATED: April 26, 2018 at Honolulu, Hawai'i.

_____
Derrick K. Watson
United States District Judge

---

*Lindstrom et al. v. Moffett Props. et al.*, CV. NO. 16-00079 DKW-RLP; **ORDER DENYING (1) DEFENDANT MICHAEL REID'S MOTION FOR SUMMARY JUDGMENT; AND (2) DEFENDANTS MOFFETT PROPERTIES AND WILLIAM B. MOFFETT'S MOTION FOR SUMMARY JUDGMENT**

---

[9]In opposition, the Lindstroms raise additional arguments in support of their UDAP claim regarding the status of Moffett Properties' trade name registration with the State Department of Commerce and Consumer Affairs.   *See* Mem. in Opp'n to Moffett Defs.' Mot. at 6–7, 18, Dkt. No. 85.   Because the Court denies the Motion with respect to Count VIII on other grounds, it does not reach these additional arguments.